**AFFIDAVIT OF SPECIAL AGENT ERIC POALINO IN SUPPORT OF
APPLICATION FOR CRIMINAL COMPLAINT**

I, Special Agent Eric D. Poalino, having been sworn, state:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since June 2021.  I am currently assigned to the Boston Field Office, North Shore Gang Task Force ("FBI Task Force").  The primary mission of the FBI Task Force is to identify, investigate, disrupt, and dismantle violent criminal organizations operating in cities north of Boston.  My responsibilities include the investigation of possible violations of federal law, including illegal possession/transfer of firearms, firearms trafficking, narcotics trafficking, and violent crimes involving firearms and narcotics trafficking.  I have received training and experience in various aspects of criminal law and procedure, including electronic and physical surveillance, interrogations, stops, searches, seizures, and arrests for a variety of criminal offenses.  Through my training, knowledge, and experience, I have become familiar with the habits, methods, routines, practices and procedures commonly employed by persons engaged in the use and trafficking of illegal firearms and narcotics, including persons involved in criminal organizations.  My investigations have included the use of surveillance techniques and the execution of search, seizure, and arrest warrants.

2.      I have written and/or participated in the execution of numerous search warrants resulting in the seizure of controlled substances and paraphernalia involved in the manufacture and distribution of controlled substances; United States currency, records of narcotics and monetary transactions, drug customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances, as well as the collection, expenditure, accounting, transportation, and laundering of drug proceeds. I have participated in

the debriefing of numerous defendants, informants and witnesses who had personal knowledge regarding large-scale narcotics trafficking organizations. I have participated in all aspects of drug investigations including conducting surveillance, executing searches pursuant to court-ordered search warrants, executing arrests, and participating in court-authorized Title III wiretaps of cellular phones. I have received extensive specialized training in the field of controlled substance identification, investigation and enforcement. Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including methods used by them to distribute, store and transport narcotics and to collect, expend, account for, transport, and launder drug proceeds.

3.      I make this affidavit in support of an application for criminal complaint and arrest warrant charging PERLA SOTO PIMENTEL (dob: xx/xx/1990, ssn: xx-xx-1866) (hereinafter "SOTO") with Conspiracy to Possess Five or More False Identification Documents with Intent to Unlawfully Use, in violation of 18 U.S.C. § 1028(a)(3), (f). SOTO's coconspirator, Krishna CASTILLO, is currently charged by way of Indictment in Docket No. 24-CR-10049 (formerly 24-7001-JCB, when charged by way of Complaint).

4.      Under Federal Law, a false identification document is "a document of a type intended or commonly accepted for the purposes of identification of individuals that" "is not issued by or under the authority of a governmental entity" and "appears to be issued by or under the authority of" "a State." 18 USC § 1028(d)(4). A counterfeit driver's license or identification card purportedly issued by a state is "a document of a type intended or commonly accepted for the purposes of identification of individuals." It is a violation of federal law to possess five or more false identification documents with the intent to use them.

5.      As described in this affidavit, the investigation has revealed numerous counterfeit licenses bearing SOTO's photograph and personal identifying information belonging to other persons, specifically customers of Verizon Wireless, were generated by CASTILLO and SOTO. Those counterfeit driver's licenses bearing SOTO's photograph and Verizon Wireless customer information were utilized to conduct fraudulent transactions at Verizon Wireless stores in Massachusetts, and other locations across the United States, during the period of February 2022 through September 2023.

6.      All dates, time and amounts are approximate. Because this affidavit is being submitted for the limited purpose of securing the requested complaint and arrest warrant, I have not included each and every fact known to me concerning this investigation.

## PROBABLE CAUSE

7.      On January 23, 2023, investigators executed a series of search warrants at Apartment 433 located in 150 Heard Street, Chelsea, Massachusetts, which is the "One North" apartment complex (the "TARGET LOCATION"). The TARGET LOCATION was determined to be a premises that was fraudulently rented with a stolen identity.

## I.      THE INVESTIGATION OF APARTMENT 433

8.      On December 22, 2022, investigators reviewed lease documents for TARGET LOCATION. According to the documents, a rental application was electronically submitted, and a lease contract was executed on May 21, 2022. The rental application documents included a photo of a New Jersey (NJ) identification card in the name of O.R. (hereinafter the VICTIM).  SOTO was the second listed applicant along with O.R.

9.      The rental application listed "Protek Locating Inc" as VICTIM's employer and "utility locator" as his position within the company. A fraudulent W-2 in VICTIM's name was

submitted with the rental application which contained a Social Security number (SSN) that did not match the VICTIM's true SSN. In the submitted documents, the VICTIM's 2021 gross income on the fraudulent W-2 was listed as $172,440.00.[1] Although the submitted W-2 listed the employer name as "Protek Locating Inc", the listed employee identification number on the W-2 was not associated with Protek Locating, and was in fact associated with a company based out of Sugarland, Texas. Below is the rental application for VICTIM along with the fraudulent W-2 are below:

| Financial | | | |
|---|---|---|---|
| Income Details | | | |
| Current Employer | | | |
| Employer Name: | PROTEK LOCATING INC | | |
| Address | 1037 51ST AVE LONG ISLAND CITY, NEW YORK 11101 United States | | |
| Income: | 937.50 | Position: | Ulitity locator |
| Started On: | 08/15/2015 | | |

---

[1] Federal tax withheld in the fraudulent W-2 was $14,093. This equates to roughly a 12% tax on the gross income, which investigators believe is implausible for the listed gross income. The gross income stated on the fraudulent W-2 submitted to the leasing company would generate a $14,370 per month in income. This is contradictory to the listed income for VICTIM on the rental application document which stated the income to be $937.50 per week (or $3,750 per month.) This equates to a $10,620 discrepancy in earned income between the figures listed on the rental application and the fraudulent W-2.

| Copy B--To Be Filed With Employee's FEDERAL Tax Return | | | OMB No. 1545-0008 |
| --- | --- | --- | --- |
| This information is being furnished to the Internal Revenue Service. | | | |
| a. Employee's social security number ▉▉▉427 | 1. Wages, tips, other compensation 172440.00 | 2. Federal income tax withheld 14093.16 | |
| b. Employer ID number (EIN) ▉▉2661 | 3. Social security wages 172440.00 | 4. Social security tax withheld 3700.80 | |
| | 5. Medicare wages and tips 172440.00 | 6. Medicare tax withheld 865.44 | |
| c. Employer's name, address, and ZIP code | | | |
| PROTEK LOCATING INC. 1037 51ST AVE LONG ISLAND CITY, NY 11101 | | | |
| d. Control number | | | |
| e. Employee's name, address, and ZIP code ▉▉▉▉▉ | | | |
| 7. Social security tips | 8. Allocated tips | 9. | |
| 10. Dependent care benefits | 11. Nonqualified plans | 12a. Code See inst. for Box 12 | |
| 13. Statutory employee | 14. Other | 12b. Code | |
| Retirement plan | | 12c. Code | |
| Third-party sick pay | | 12d. Code | |
| 15. State NY   Employer's state ID number | 16. State wages, tips, etc. 172440.00 | 17. State income tax 3969.44 | |
| 18. Local wages, tips, etc. | 19. Local income tax | 20. Locality name | |

| Copy 2--To Be Filed With Employee's State, City, or Local Income Tax Return | | | OMB No. 1545-0008 |
| --- | --- | --- | --- |
| a. Employee's social security number ▉▉▉1427 | 1. Wages, tips, other compensation 172440.00 | 2. Federal income tax withheld 14093.16 | |
| b. Employer ID number (EIN) ▉▉2661 | 3. Social security wages 172440.00 | 4. Social security tax withheld 3700.80 | |
| | 5. Medicare wages and tips 172440.00 | 6. Medicare tax withheld 865.44 | |
| c. Employer's name, address, and ZIP code | | | |
| PROTEK LOCATING INC. 1037 51ST AVE LONG ISLAND CITY, NY 11101 | | | |
| d. Control number | | | |
| e. Employee's name, address, and ZIP code ▉▉▉▉▉ | | | |
| 7. Social security tips | 8. Allocated tips | 9. | |
| 10. Dependent care benefits | 11. Nonqualified plans | 12a. Code See inst. for Box 12 | |
| 13. Statutory employee | 14. Other | 12b. Code | |
| Retirement plan | | 12c. Code | |
| Third-party sick pay | | 12d. Code | |
| 15. State NY   Employer's state ID number | 16. State wages, tips, etc. 172440.00 | 17. State income tax 3969.44 | |
| 18. Local wages, tips, etc. | 19. Local income tax | 20. Locality name | |

10.     A Google search of Protek Locating Inc, as listed on the rental application and W-2, produced an image of a residential building. The Google search also showed the Protek Locating Inc to have two Google reviews, and a Facebook page associated with the business has 16 likes and 16 followers, all of which are hidden from view.

11.     The rental application as well as the lease contract bore the purported electronic signatures of VICTIM and SOTO for a lease term of one year, May 22, 2022 – May 20, 2023. The lease contract specified a $3,658.00 per month rent, not including utilities and other services, which per the lease contract, were to be paid to the landlord. Throughout the lease contract, the VICTIM's name and initials are purported to be electronically signed, agreeing to the terms of the lease contract.

12.     For identification purposes, investigators attempted to call the phone number for VICTIM that was submitted on the rental application for TARGET LOCATION. The phone

number (ending in 7541) was a non-working number.  Massachusetts Department Criminal Justice Information Services (CJIS) as well as ACCURINT, a commercially available public records database, indicated that the VICTIM still resided in New Jersey. A working phone number for the VICTIM was obtained, at which point a telephone interview was conducted with VICTIM by investigators. Prior to the interview, VICTIM confirmed his identity, verifying his name, date of birth, address, Social Security number, driver's license number, as well as his physical features and attributes. This was a precautionary measure by investigators to confirm VICTIM was in fact O.R. and to further solidify he was associated with the TARGET LOCATION.

13.     During the interview, VICTIM stated he has never visited Massachusetts, has never applied to rent any property in Massachusetts, was not renting any residential property in Massachusetts, and has not authorized any individual to utilize his personal information for purposes of renting, or leasing any apartment. VICTIM stated he lost his NJ identification card in the recent past and never recovered it. VICTIM stated he does not remember where, or when he lost his NJ identification card. VICTIM stated he has never worked for Protek Locating Inc. and furthermore has never heard of the company.

## II.     THE SEARCH OF APARTMENT 433

14.     Investigators executed a search warrant for the TARGET LOCATION on January 23, 2023. Once investigators gained entry into TARGET LOCATION, two juvenile females and one adult female were encountered. The adult female will be referred to as A.F. The juveniles as well as A.F. stated that: (1) no other individuals were present, (2) that TARGET LOCATION belonged to CASTILLO, and that CASTILLO has been away at work for approximately a week and a half. The juveniles identified themselves as the daughters of CASTILLO.

15.     Investigators began searching TARGET LOCATION and quickly observed a significant amount of a hard white substance that based on the collective training and experience of the investigators present, was believed to be crack cocaine. The suspected crack cocaine was in cellophane packaging and located in a small mesh basket on a shelf in the closet of the master bedroom (Bedroom E). The closet of Bedroom E does not have a door or barrier of any kind. Instead, it is an open portion to the bedroom itself. In Bedroom E, investigators also located a small blown out baggy with a hard white/yellow substance, a small glass vial containing a hard white/yellow substance, white residue in numerous plastic baggies, white residue in a trash bag, a digital scale with white residue, materials consistent with the packaging and sale of drugs/narcotics, and a Glock firearm carrying case.

16.     Investigators immediately stopped the search and obtained an expanded search warrant authorizing the seizure of drug and firearm items.

17.     Investigators located numerous items in Bedroom E that belonged to CASTILLO including paperwork with her name on it such as credit card applications, tax documents, and her U.S. Passport. Bedroom E also contained a significant amount of women's clothing, footwear, and accessories including high value items such as Gucci shoes, Louis Vuitton purses, and Cartier sunglasses. According to the juveniles, Bedroom E is where CASTILLO slept.

18.     In a closet within the den was a backpack. Inside the backpack was a high capacity feeding device/Glock magazine.

19.     In total, investigators located 16 identification cards/driver's licenses in the TARGET LOCATION. Most of the counterfeit driver's licenses contained the same exact picture of SOTO; one counterfeit driver's license contained a picture of another female associate of CASTILLO who I will refer to as C.A.; and two counterfeit driver's licenses contained the image

of Krishna CASTILLO. Each counterfeit driver's license had different personal identifying information ("PII") on it and were purported to have been issued by various states throughout the United States. The driver's licenses and identification cards appear legitimate to the naked eye as they contain the security measures such holograms, barcodes, and the proper texture etc.

20.     The driver's licenses bearing SOTO's photograph that were recovered contained the following information:

| Victim Initials | State | Last Four License # |
|---|---|---|
| K.D. | New Hampshire | 7869 |
| P.K. | Maine | 6260 |
| M.M. | Maine | 6260 |
| J.J. | Connecticut | 0178 |
| R.M. | Connecticut | 6014 |
| P.C. | New Hampshire | 9601 |
| M.A. | New Hampshire | 8384 |
| K.P. | New Hampshire | 9627 |
| D.I. | Maine | 6260 |
| F.G. | Maine | 6260 |
| J.H. | Connecticut | 4042 |
| K.F. | New Hampshire | 5715 |
| J.T. | Rhode Island | 1928 |
| S.M. | Nebraska | 6138 |

21.     Still images of the counterfeit driver's licenses bearing SOTO's photograph follow:

 

8

















 

 

## III.   FURTHER REVIEW OF INFORMATION DERIVED FROM CASTILLO'S PHONE

22.     Through this investigation and review of information derived from CASTILLO's cellular phone, investigators have learned that Krishna CASTILLO and Perla SOTO engage in large-scale identity theft, fraud, and theft utilizing counterfeit identifications for transactions that are conducted by SOTO, CASTILLO and others. This fraud takes place across the country and has resulted in at least $280,000 in losses that have been identified thus far.

23.     For example, the counterfeit driver's licenses recovered from the TARGET LOCATION on January 23, 2023, are known to contain the PII of active legitimate customers for Verizon Wireless, (the "Wireless Company"). The photographs on these counterfeit driver's licenses were those of CASTILLO, SOTO and C.A, but the PII belonged to the customers of the Wireless Company.   The PII listed on the counterfeit identifications were later queried and

determined to be associated with cellular phone accounts that had been subject to a fraudulent transactions known as an account takeover scheme.

24.     After speaking with an investigator from the Wireless Company and then reviewing the contents of CASTILLO's cellular phone and other cellular phones, investigators learned that CASTILLO, SOTO, C.A., and other associates of CASTILLO utilize the counterfeit identifications to pose as the individual listed on the card and conduct an account takeover at the Verizon Wireless store.

25.     Investigators requested information from an investigator with the Wireless Company about any losses associated with accounts in the names of the stolen PII listed on the counterfeit identifications recovered from the TARGET LOCATION on January 23, 2023, and other PII found within the data associated with CASTILLO's cellular phone. The data included, specifically: (1) numerous photographs of counterfeit licenses were found in data derived from CASTILLO's cellular phone; (2) "Notes" that listed stolen customer account information, and (3) screen captures of text messages where CASTILLO was receiving stolen customer account information. Investigators located well over 300 separate stolen identities in the data derived from CASTILLO's cellular phone.

26.     Examples follow below:

       a.   Image Filename: BA336A34-19D4-4811-952C-5778A2445458.



b.  Notes:

| Created:<br>9/16/2022<br>9:12:40 PM(UTC-4)<br>Modified:<br>9/17/2022<br>12:37:52 AM(UTC-4) | Title: cuentas : 24 9,600<br>Summary: ids 24 2400<br>Source: Notes<br>Labels:<br>Body: cuentas : 24 9,600<br>ids 24 2400<br><br><br>money spent<br>1300 taxes<br>500 rental<br>1200 ids<br>7 |
| --- | --- |
| Created:<br>8/30/2022<br>2:19:31 AM(UTC-4)<br>Modified:<br>12/11/2022<br>2:08:00 PM(UTC-5) | Title: perla 22 phones  pay 5,500<br>Summary: 1250 hots<br>Source: Notes<br>Labels:<br>Body: perla 22 phones  pay 5,500<br>1250 hots<br>600 perla<br>800 dub<br>1800 rent month of august<br>before trip and during 300for phone bill and things<br>you needed /200 target & clothes<br><br>——— total 550<br><br>titi 14 phones perl 50 per phone /700<br><br>overall owed to perla 1250 |

27.     In the course of the investigation, investigators also located text messages between CASTILLO and another coconspirator who I will refer to as CC-1, wherein they discuss the account takeover scheme and SOTO's participation. For example:

    a.   On 9/23/22, CC-1 sent a text message to CASTILLO stating: "Perla jus pulled 4 phones in 1 store."

    b.   On 10/25/22, CC-1 sent a text message to CASTILLO stating: "Perla got ids."

    c.   On 10/31/22, CC-1 and CASTILLO had the following exchange:

CC-1:          We gone drive back to Kansas n buy tickets from kansas

CC-1:          Cuz dese shits ain't hitting

CC-1:          I dun drove across da world

CC-1           N Niggas ain't hitting shit w dese ids

CASTILLO:   i got new ones ima go n keep working with perla u can come home

28.     In total, the Wireless Company reported over $280,000 in total losses to investigators related accounts associated with PII found within the data recovered from CASTILLO's cellular phone, or physical licenses recovered on January 23, 2023. Those losses were comprised of cellular phones and other items purchased through fraudulent account takeover where the victim's stolen PII was utilized to conduct the transaction.

29.     The investigator with the Wireless Company reported that all of the more than $280,000 in losses were associated with account takeover schemes. The investigator described an account takeover scheme as follows:

    a.   An individual enters a store for the Wireless Company and claims to store personnel that they have lost their phone.

    b.   The individual claims to be the account holder and presents an identification in the name, address and date of birth of the account holder, but bears the photograph of the individual present in the store. Because their phone is claimed

to be lost, the Wireless Company cannot initiate a two-factor authentication by sending a message to the cellular device.

c.   The individual then purchases a replacement phone and other products and elects to charge the purchase to the account, to be paid-for over time as part of the monthly bill. New lines can also be opened as well, and phones will be purchased to service these new lines. Often these purchases are new and top-of-the-line Apple iPhones and Samsung cellular phones that cost upwards of $1,000 each. The investigator stated that company policy requires the presentation of government issued identification from the customer in order to conduct the types of transactions that cause charges to be made to the account, such as the purchase of a new cellular phone.

d.   The individual exits the store with the newly purchased cellular phone and products without having had to expend any money, except potentially taxes or small incidental costs. The newly purchased cellular phone is provisioned to the account holder's phone number, and the account holder's phone number is now associated with the device(s) obtained by the individual who stole their identity.

e.   Generally, within a short period of time, the true account holder contacts the Wireless Company to report the fraud. This generally arises because the true account holder no longer has access to their phone number and their phone does not work.  Upon verifying the true identity and fraudulent nature of the transaction, the Wireless Company deactivates the newly purchased phone, lists it as stolen, and "blacklists" the device from activation on U.S. based cellular networks.

f.   Despite being blacklisted, cellular networks in other countries will activate those devices.  Additionally, investigators are aware that stolen and blacklisted cellular devices, especially newer models, can be sold to dealers in other countries at significant profit despite their questionable origin.

30.   As noted above, investigators reviewed data from CASTILLO's cellular phone, and other cellular phones utilized by coconspirators. Review of that data revealed the following concerning the account takeover scheme:

a.   CASTILLO obtains the stolen PII and additional information about the customer including the customer's telephone number, account PIN, last four of the SSN for the stolen identity, and current make and model of phone active on the account.

b.   CASTILLO coordinates the execution of the fraudulent scheme, and oversees the logistics of travelling to stores throughout the county to conduct the scheme.

c.  CASTILLO coordinates the transportation and sale of the stolen devices overseas and had lists of cellular devices and sale prices from these foreign dealers.

d.  CASTILLO herself coordinates and pays for the stolen PII receiving the information digitally through her cellular phone.

e.  Once in possession of the stolen PII, CASTILLO then coordinates the creation of the counterfeit identification card bearing the stolen PII and provides the photograph of the associate, such as SOTO, who will be conducting the actual fraudulent transaction.  CASTILLO also provides payment to the associates who create the counterfeit driver's licenses. Investigators located ledgers wherein it stated, for example: "Perla 22 phones Pay 5500" which would equate to SOTO being paid $250 per phone.

f.  In the cellular phone data, investigators located hundreds of additional stolen identities that CASTILLO has obtained. All of the stolen identities appear to be customers of the Wireless Company.

31.  Investigators provided the stolen PII to the investigator for the Wireless Company in order for the specific transactions to be identified, losses to be tallied and the surveillance video to be located. As noted above, the investigator for the Wireless Company identified over $290,000 in losses associated with account takeover schemes conducted on accounts associated with: (1) the PII found in CASTILLO's apartment; (2) the PII in the data derived from CASTILLO's cellular phone; (3) the dates and times of known travel by CASTILLO and SOTO to certain geographic areas where account takeover took place that could be supported by surveillance video of CASTILLO, SOTO or other coconspirators conducting the transaction. The transactions identified by the investigators for the Wireless Company took place from February 2022 through December 18, 2023 (with two transactions taking place in 2020, and one in 2021).  Over 120 separate accounts were subject to fraudulent transactions through this scheme.

32.  The Wireless Company provided over 25 instances where SOTO or CASTILLO entered a retail location of the Wireless Company and furnished a counterfeit identification bearing

stolen PII to conduct a fraudulent account takeover transaction. Examples of those incidents follow:

| Date | Store Location | Victim Initials / Related Counterfeit License or PII Location | Loss During Transaction / Suspect | Surveillance Image |
|---|---|---|---|---|
| 6/30/22 | North Attleboro, MA | K.P.<br><br>Counterfeit license with Victim PII recovered on 1/23/23 | $3,459<br><br>SOTO |  |
| 8/2/22 | Memphis, TN | J.M.<br><br>Victim PII recovered from Notes on CASTILLO Phone | $2,929<br><br>SOTO |  |

| | | | | |
|---|---|---|---|---|
| 8/5/22 | Harahan, LA (Elmwood) | L.P. | $1,199<br><br>CASTILLO |  |
| 8/6/22 | Dallas, TX | S.H.<br><br>Victim PII recovered from Notes on CASTILLO Phone | $529<br><br>SOTO |  |
| 8/6/22 | Waxahachie, TX | A.R. | $2,259<br><br>CASTILLO & SOTO |  |
| 8/15/22 | Denham Springs, LA | P.K.<br><br>Victim PII recovered from Notes on CASTILLO Phone | $1,199<br><br>SOTO |  |

| | | | | |
|---|---|---|---|---|
| 8/16/22 | Slidell, LA | R.G. | $3,259<br><br>SOTO |  |
| 9/16/22 | San Antonio, TX | K.M.<br><br>**Victim PII recovered from Notes on CASTILLO Phone** | $2,099<br><br>SOTO |  |
| 9/20/22 | Grand Prairie, TX | S.O.<br><br>**Victim PII recovered from Notes on CASTILLO Phone** | $1,099<br><br>SOTO |  |

| 9/27/22 | Flower Mound, TX | S.E. | $1,629 SOTO |  |
|---------|------------------|------|-------------|----------------------|
| 10/24/22 | Kansas City, MO | L.R. | $4,359 SOTO |  |
| 10/25/22 | Merriam, KS | C.J. | $3,259 SOTO |  |

| 10/28/22 | Bellevue, NE | P.O.<br><br>**Victim PII recovered from Notes on CASTILLO Phone** | $3,259<br><br>SOTO |  |
|---|---|---|---|---|
| 10/29/22 | Omaha, NE | K.G.<br><br>**Victim PII recovered from Notes on CASTILLO Phone** | $3,259<br><br>SOTO |  |
| 10/29/22 | Omaha, NE | D.D. | $3,666<br><br>SOTO |  |

| 11/6/22 | Aurora, CO | **L.T.**<br><br>**Victim PII recovered from Notes on CASTILLO Phone** | **$3,259**<br><br>**SOTO** |  |
|---|---|---|---|---|
| 11/7/22 | Colorado Springs, CO | **A.R.**<br><br>**Victim PII recovered from Notes on CASTILLO Phone** | **$1,000**<br><br>**SOTO** |  |
| 11/7/22 | Colorado Springs, CO | **N.C.**<br><br><br><br>**Counterfeit license with Victim PII recovered on 1/23/23** | **$1998**<br><br>**CASTILLO** |  |

| 11/9/22 | Johnstown, CO | **P.D.**<br><br>**Victim PII recovered from Notes on CASTILLO Phone** | **$2,629**<br><br>**CASTILLO** |  |
|---|---|---|---|---|
| 1/9/23 | Gresham, OR | **C.P.**<br><br>**Victim PII recovered from Screen Capture derived from CASTILLO PHONE** | **$3,529**<br><br>**SOTO** |  |
| 1/9/23 | Portland, OR | **C.S.**<br><br>**Victim PII recovered from Notes on CASTILLO Phone**<br><br><br><br>**Image of counterfeit license with Victim PII recovered from CASTILLO phone** | **$1,899**<br><br>**SOTO** |  |

| 1/10/23 | Vancouver, WA | A.B.<br><br>**Victim PII recovered from Notes on CASTILLO Phone**<br><br>**Victim PII recovered from Screen Capture derived from CASTILLO PHONE** | $799<br><br>**SOTO** |  |
|---|---|---|---|---|
| 1/25/23 | Renton, WA | S.B.<br><br>**Victim PII recovered from Notes on CASTILLO Phone**<br><br>**Victim PII recovered from Screen Capture derived from CASTILLO PHONE** | $1,999<br><br>**SOTO** |  |
| 2/25/23 | Columbus, GA | K.P.<br><br>**Victim PII recovered from Notes on CASTILLO Phone**<br><br>**Victim PII recovered from Screen Capture derived from CASTILLO PHONE** | $1,199<br><br>**SOTO** |  |

| 3/31/23 | Seneca, SC | T.E.<br><br>Victim PII recovered from Notes on CASTILLO Phone<br><br>Victim PII recovered from Screen Capture derived from CASTILLO PHONE | $3,629<br><br>CASTILLO |  |
|---|---|---|---|---|
| 9/6/23 | Portsmouth, NH | R.S.<br><br>Victim PII recovered from Notes on CASTILLO Phone<br><br>Victim PII recovered from Screen Capture derived from CASTILLO PHONE | $1,199<br><br>SOTO |  |

## CONCLUSION

33.     Following the execution of the search warrant on January 23, 2023, investigators applied for a criminal complaint charging SOTO with state criminal offenses related to the counterfeit driver's licenses and identity fraud.   See Chelsea District Court, Docket No. 2314CR00281.  A criminal complaint issued by summons, with arraignment scheduled for March 7, 2023. SOTO failed to appear at the arraignment and entered warrant status on March 7, 2023.

SOTO was apprehended on December 28, 2023.  According to NCIC, SOTO is also wanted on an outstanding warrant from Columbia, South Carolina.  According to the Richland County, SC, public court index, SOTO is in failure to appear status related to Case No. 2021A4021601796, which charges her with Financial Identity Fraud or Identity Fraud.  SOTO was indicted on this case in September 2023, and failed to appear on November 16, 2023, and remains in warrant status on that matter.

34.    Based on the foregoing, there is probable cause that Perla SOTO has violated 18 U.S.C. § 1028(a)(3), (f), by conspiring to possess five of more false identification documents with intent to unlawfully use them.

Sworn to telephonically in accordance with Federal Rule of Criminal Procedure 4.1 on March 1, 2024.

Eric D. Poalino
Special Agent, Federal Bureau of Investigation

Electronically sworn to and subscribed telephonically in accordance with Federal Rule of Criminal Procedure 4.1 on March 1, 2024.

Hon. Donald L. Cabell
Chief United States Magistrate Judge